## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**EBONY SMITH, et al.,**

     **Plaintiffs,**

          **Case No. 1:24-cv-545**

    **v.**

          **JUDGE DOUGLAS R. COLE**

**KOCH MEAT CO., INC., et al.,**

     **Defendants.**

## OPINION AND ORDER

Defendants Koch Meat Co., Inc., and Koch Foods of Cincinnati, LLC (collectively Koch), move to dismiss Plaintiffs Ebony and Chris Smiths' retaliation claims. For the reasons explained below, the Court **DENIES** Defendants' Motion to Dismiss Counts VI, VII, and VIII of Plaintiffs' Amended Complaint (Doc. 13).

## BACKGROUND[1]

Ebony Smith,[2] an African American woman, began working for Koch's Fairfield Ohio Production Facility (Fairfield Facility) as an occupational nurse in January 2023. (Am. Compl., Doc. 12, #142, 144). According to Ebony, ever since she began there, her time at Koch has been marred by unlawful discrimination, harassment, and retaliation based on both race and sex.

---

[1] Because this matter comes before the Court on a motion to dismiss, the Court accepts the well-pleaded allegations in the Amended Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But in reporting the background here based on those allegations, the Court reminds the reader that they are just that—allegations.

[2] Because Ebony and Chris Smith share the same last name, the Court will refer to each by their first name to avoid confusion.

Start with the allegations surrounding her supervisor, Valerie Hines—Fairfield Facility's Employee Safety and Health Manager. (*Id.* at #144). Soon after Ebony started working at Koch, Hines allegedly warned Ebony that Ebony "should never talk to" Human Resources Manager Wrai Fite and Employee Relations Manager Angel Sandfoss because "doing so 'only ends with trouble.'" (*Id.*). Hines then made various racist comments to Ebony. (*Id.*). Ebony recalls Hines stating that Koch's "African employees … were 'entitled and lazy,'" that they don't know how to clean "because they [are] used to living on dirt floors," and that, in reference to Ebony's hairstyle, "[y]ou Black girls are always doing something with your head[s]." (*Id.* at #144–45).

Upset by Hines's comments but reluctant to go to Human Resources (HR) given Hines's prior warning, Ebony discussed Hines's conduct with Delores McQueen, another African American nurse at Koch. (*Id.* at #145). McQueen, who had apparently endured similar commentary from Hines, relayed Ebony's concerns to Sandfoss, which prompted Sandfoss to meet with Ebony. (*Id.*). At that meeting, Sandfoss assured Ebony that she would report Ebony's complaints about Hines to the Fairfield Facility's General Manager, Brian Reisen. (*Id.*).

But that meeting was useless—at least according to Ebony. Rather than confronting Hines about her behavior, Sandfoss told Ebony that "Hines was well known for making bigoted comments, and that everyone in management knew about it." (*Id.*). And since Hines was apparently set to retire in April 2024 (which was then fourteen months away), Sandfoss instructed Ebony to simply "hang in there" and

"ride it out" until Hines's retirement. (*Id.*). Sandfoss further conveyed that she had informed Hines of Ebony's complaints about Hines's racist comments. (*Id.* at #145–46). Nevertheless, in the months following Ebony's meeting with Sandfoss, Hines allegedly continued to make racist statements to Ebony. (*Id.* at #146).

Hines, however, wasn't the only (alleged) bad actor at the Fairfield Facility. So too was Marque Haynes, one of the Plant Managers, who Ebony alleges is a "convicted felon and registered sexual predator." (*Id.*). One time, in February 2023, Ebony informed Haynes that he had been selected to take a random drug test. (*Id.*). After he insisted that he did not need to take it, Ebony contacted Hines to confirm that was true. (*Id.*). Hines then told Haynes what Ebony had asked. (*Id.* at #146–47). That apparently angered Haynes. He "stormed" into Ebony's office, "erupted into a profanity-laced tirade," and moved increasingly closer to Ebony until he stood over her yelling. (*Id.* at #147). Another employee had to come usher Haynes out of the office. (*Id.*).

Later, in April 2023, Ebony had another run-in with Haynes. When Ebony tried to send a sick maintenance employee home, Haynes told the employee to go back to work or "get suspended." (*Id.*). Displeased that Haynes had prevented her from protecting the Koch employee's health, Ebony called Hines and requested that Haynes not be present when she treated or evaluated employees. (*Id.* at #147–48). When Hines returned Ebony's call, Haynes was also on the line. (*Id.* at #148). Haynes screamed at Ebony for trying to "tell [him] what to do." (*Id.*). Hines said nothing. (*Id.*).

Soon after those verbal altercations, Haynes allegedly began to sexually harass Ebony. (*Id.*). At first, Haynes would visit Ebony's office and make sexually suggestive and vulgar comments to her, in addition to making sexual gestures. (*Id.*). Eventually, though, he physically assaulted her. Ebony reports that on multiple occasions, Haynes groped her buttocks and breasts, put his hand between her legs, and attempted to place her hands on his body. (*Id.* at #149). She alleges that at least one time, Haynes entered the nurse's office, locking the door behind him, pinned Ebony's body down, and "forcefully kissed her on the mouth." (*Id.*). On a separate occasion, Ebony says Haynes assaulted her while she was helping another employee. (*Id.* at #150). While the employee wasn't looking, Haynes apparently stood behind Ebony and forced his hand between her legs. (*Id.*). And on yet another day, Haynes lured Ebony into an elevator by claiming he needed help with an injured employee, and after acknowledging there were "no cameras," proceeded to kiss and grope her. (*Id.*). Each time Haynes harassed Ebony, she would tell him to "go away" or ignore him, and when he physically assaulted her, she would struggle to push him away and break free from his grasp. (*Id.* at #148–50).

In June or July of 2023, Ebony transferred to a different shift at the newly opened Fairfield Facility Plant B. (*Id.* at #151). She believed that moving from Plant A (where she had been working) to Plant B would protect her from Haynes's advances. (*Id.*). But, per Ebony's telling, it did not. Before Ebony officially transferred, Haynes told her she "could not leave," picked her up, and again forcefully tried to kiss her and put her hand into his pants. (*Id.*). And even after Ebony transferred to Plant B,

4

Haynes would show up at her new shift and engage in the same sort of conduct he had undertaken when she worked at Plant A. (*Id.* at #151–52). Ebony therefore started locking herself in the nurse's office, putting the "out to lunch" sign in the window, closing the blinds, and turning out the lights whenever she suspected Haynes was at Plant B. (*Id.* at #152). But apparently even that didn't stop Haynes. He used his all-access badge to swipe into the nurse's office, where he found Ebony. (*Id.*). So Ebony resorted to asking other employees to sit with her in the nurse's office on days she knew Haynes would be in Plant B. (*Id.*).

Eventually, Koch fired Haynes. (*Id.*). But according to Ebony, Koch never addressed his practice of harassing her and other female employees. (*Id.* at #153). Rather, Koch fired Haynes for time theft. (*Id.* at #152). Even so, after Haynes's termination, HR asked Ebony for a statement about the harassment she endured. (*Id.* at #153). Ebony says that Koch initiated that investigation merely to oppose Haynes's claim for unemployment benefits, not to properly address the "appalling sexual harassment" that occurred. (*Id.*).

Apparently displeased with Koch's handling of Haynes's conduct and Koch's failure to provide its employees a copy of its sexual harassment policy, Ebony filed a Charge of Discrimination and Harassment with the Ohio Civil Rights Commission (OCRC) and the Equal Employment Opportunity Commission (EEOC) on April 26, 2024. (*Id.* at #154). She claims Koch has continued to unlawfully harass her and retaliate against her for doing so. (*Id.*).

Specifically, Ebony points to an interaction she had on May 31, 2024, with New Hire Training Manager, Jacqueline Camacho—another alleged bad actor. (*Id*.). According to Ebony, Camacho entered the nurse's office "without having any business purpose to for doing so" and proceeded to share a racist story about catfish. (*Id*.). Camacho allegedly said that someone told her "catfish are really just [n-words]" and that "if you roll a chicken liver in Kool-Aid, they'll bite it." (*Id*.). She added that "her daughter tried it and caught a catfish that way." (*Id*.). Ebony alleges that Camacho told the story twice during her time in the nurse's office. (*Id*.). Once Camacho finally left the office, Ebony and her African American co-worker (who was also in the nurse's office at the time) were "stunned and deeply bothered" by Camacho's comments. (*Id.* at #154–55). They concluded that the only explanation for the racist story was that Koch "was trying to deliver some kind of message to Ebony" for complaining about and opposing the discrimination and harassment she had endured. (*Id.*).

Ultimately, Ebony and her husband, Chris, filed this eleven-count lawsuit on September 30, 2024. Ebony alleges harassment based on sex under Title VII and the Ohio Civil Rights Act (Counts I and II); harassment based on race under Title VII, Ohio Revised Code Chapter 4112, and 42 U.S.C. § 1981 (Counts III, IV, and V); retaliation under Title VII, Ohio Revised Code Chapter 4112, and § 1981 (Counts VI, VII, and VIII); negligent hiring, supervision, promotion, and retention (Count IX); and intentional infliction of emotional distress (Count X). (*Id.* at #155–63). Chris alleges loss of consortium (Count XI). (*Id.* at #163–64).

Koch originally moved to dismiss Ebony's retaliation claims—Counts VI, VII, and VIII—arguing that Ebony failed to plausibly allege that Koch subjected her to an adverse employment action. (*See generally* Doc. 7). But before that motion became ripe, Ebony filed an Amended Complaint, (Doc. 12), which mooted Koch's November 14, 2024, motion, (*see* 12/17/25 Not. Order).

Koch now moves (for a second time) to dismiss Ebony's retaliation claims. (Doc. 13). It renews its original argument that Ebony failed to plausibly allege an adverse employment action. (*Id.* at #171). Koch further argues that the single factual allegation Ebony added to her Amended Complaint does not cure the defects that the original complaint suffered. (*Id.* at #169).

Ebony responded to Koch's motion. (Doc. 14). She argues that the Amended Complaint does allege sufficient facts to support a retaliation claim. (*Id.* at #187–92).

Koch has since replied. (Doc. 16). So the motion is now ripe.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege "sufficient factual matter … to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). While a "plausible" claim for relief does not require a showing of probable liability, it requires more than "a sheer possibility that a defendant has acted unlawfully." *Id.* The complaint must allege sufficient facts to allow the Court "to draw the reasonable inference that the defendant is liable." *Id.*

At the motion-to-dismiss stage, in assessing plausibility of the merits, the Court "must accept the complaint's well-pleaded factual allegations as true." *Lewis v. Acuity Real Est. Servs., LLC*, 63 F.4th 1114, 1116 (6th Cir. 2023); *Iqbal*, 556 U.S. at 678. And the Court must "draw all reasonable inferences" in the plaintiffs' favor. *Marchek v. United Servs. Auto. Ass'n*, 118 F.4th 830, 833 (6th Cir. 2024). But that does not mean the Court must take everything a plaintiff alleges at face value, no matter how unsupported. The Court may disregard "naked assertions" of fact or "formulaic recitations of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (cleaned up).

When it comes to Title VII claims, "a plaintiff is not required to prove a prima facie case to survive a motion to dismiss." *Finley v. Miami Univ.*, 504 F. Supp. 3d 838, 844 (S.D. Ohio 2020) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). That's because *McDonnell Douglas*'s burden-shifting framework, which applies to Title VII claims, "is an evidentiary standard, not a pleading standard." *Jackson v. Crosset Co.*, 33 F. App'x 761, 762 (6th Cir. 2002). Title VII complaints, therefore, are not subject to any kind of heightened pleading standard, because that would "too narrowly constrict the role of the pleadings." *Swierkiewicz*, 534 U.S. at 511 (cleaned up). But the pleading rules in employment discrimination cases are no less stringent than pleading standards for other federal causes of action. *Finley*, 504 F. Supp. 3d at 844 (citing *Smith v. Wrigley Mfg. Co., LLC*, 749 F. App'x 446, 449 (6th Cir. 2018)). Instead, "the ordinary rules for assessing the sufficiency of a complaint apply." *Swierkiewicz*, 534 U.S. at 511.

"Moreover, while a plaintiff need not establish a prima facie case at the pleading stage, the elements of a prima facie case are nonetheless aspects to consider when determining the plausibility of a discrimination claim." *Finley*, 504 F. Supp. 3d at 844 (collecting cases). Ultimately, though, the Court must employ its "judicial experience and common sense" to determine plausibility. *Iqbal*, 556 U.S. at 679.

### LAW AND ANALYSIS[3]

Koch only seeks dismissal of Ebony's retaliation claims. (*See generally* Doc. 13). Those retaliation claims arise out of two scenarios. First, Ebony alleges that, in retaliation for her complaining to McQueen and Sandfoss about Hines's racist comments, Hines continued harassing Ebony and Haynes began harassing Ebony, while Koch, aware of Hines's and Haynes's harassment, took no action to stop it. (Doc. 12, #145–48, 153; Doc. 14, #187–90). Second, Ebony alleges that, in retaliation for her filing a charge of discrimination and harassment with the OCRC and the EEOC, Camacho shared a racist story about a catfish to harass Ebony. (Doc. 12, #154–55; Doc. 14, #190).

Title VII "protects employees from conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 345 (6th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Absent direct evidence of

---

[3] The same framework applies to each of Ebony's three retaliation claims, which she brings under Title VII, Ohio Revised Code Chapter 4112, and 42 U.S.C. § 1981. *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021); *Threat v. City of Cleveland*, 6 F.4th 672, 681 (6th Cir. 2021).

retaliation (Ebony does not suggest she has any), the prima facie elements of a Title VII retaliation claim are: (1) Ebony engaged in Title VII protected activity; (2) Koch knew she had exercised her protected rights; (3) Koch then took a materially adverse employment action; and (4) a causal connection exists between the protected activity and the adverse action. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021). Importantly, in lieu of direct adverse employment action, a plaintiff can satisfy the third element by alleging that she experienced retaliatory harassment. *Id.* at 426–27.

Recall that Ebony need not establish a prima facie case of retaliation at the pleading stage. Even so, she must allege facts that make her retaliation claims *plausible*. And in analyzing plausibility, the Court may consider the prima facie elements outlined above.

On that front, Koch's motion seems to argue only that Ebony's retaliation claims fall short on the third element—i.e., whether Koch imposed a materially adverse employment action. (*See generally* Doc. 13). Specifically, Koch says that (1) its failure to adequately investigate Ebony's complaints is not "adverse action"; (2) if Ebony is relying on a hostile work environment theory of adverse action, she did not allege sufficient facts to clear the plausibility threshold; and (3) her factual allegations demonstrate that she was not, in fact, dissuaded from engaging in protected conduct, which precludes her retaliation claim. (*Id.* at #172–77). But then in its Reply, Koch adds that Ebony failed to plausibly allege a causal connection between Ebony's complaint about Hines and Haynes's alleged harassment, and

10

between Ebony's OCRC and EEOC charges and Camacho's alleged harassment. (Doc. 16, #204–07). The Court takes each element (adverse employment action and causal connection) in turn.

## A. Ebony Has Plausibly Alleged Retaliatory Harassment.

As noted, a plaintiff can satisfy the third element of a retaliation claim by alleging retaliatory harassment (instead of direct adverse employment action). To do so, the plaintiff must allege facts suggesting that the harassment was "sufficiently severe or pervasive to alter the conditions of [] employment and create an abusive working environment." *Wyatt*, 999 F.3d at 426 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The alleged harassment, moreover, "must be both objectively and subjectively severe and pervasive to be actionable." *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 841 (6th Cir. 2024) (citing *Harris*, 510 U.S. at 23).[4]

Ebony's retaliation claims rest both on Hines and Haynes allegedly harassing her (after Ebony complained of Hines's racist remarks) and Camacho allegedly harassing her (after Ebony filed the OCRC and EEOC charges). (Doc. 14, #187–88).

---

[4] The Court notes the tension between the Sixth Circuit's admonition in *Jackson* that the *McDonnell Douglas* framework is "not a pleading standard," 33 F. App'x at 762, and the suggestion in *Ogbonna-McGruder* that a plaintiff must plausibly allege that she experienced "objectively and subjectively severe and pervasive" harassment—i.e., the third prong of the prima facie case—to proceed beyond a motion to dismiss, 91 F.4th at 841. The Sixth Circuit, however, recently confirmed again that a "plaintiff does not have to allege specific facts establishing a prima facie case of discrimination in their complaint." *Savel v. MetroHealth Sys.*, 964 F.4th 932, 944 (6th Cir. 2024). Rather, the only question here is whether the Complaint "plead[s] sufficient facts from which the court could plausibly conclude" that Koch retaliated against Ebony for engaging in protected conduct. *Id.* at 943 (cleaned up). Perhaps the point is merely that one way to meet the pleading standard would be through allegations plausibly suggesting that the plaintiff could meet the prima facie case. In other words, plausibly alleging facts supporting each of the prima facie elements is a sufficient, but not a necessary, condition for proceeding past a motion to dismiss.

Koch argues that Ebony's Amended Complaint fails to plausibly allege that the alleged harassment was sufficiently "severe or pervasive" to state a retaliation claim. (Doc. 13, #174–76). The Court disagrees.

Begin with the subjective component. The Court is satisfied that Ebony has plausibly alleged that she perceived her working environment at Koch to be "abusive." She maintains, for example, that Hines's continued racist statements upset her, that she was left "terrified and trembling" after Hines allowed Haynes to berate her, that Haynes's conduct caused her to "br[eak] down crying," and that she found it "useless" and "perilous" to complain to human resources about the harassment she allegedly endured. (Doc. 12, #146–47, 150, 155).

But that still leaves the objective component. When analyzing the objective severity and pervasiveness of alleged harassment, courts consider the totality of the circumstances. In terms of the specifics for making that assessment, courts consider the following nonexhaustive list of factors: (1) the "frequency of the discriminatory conduct"; (2) "its severity"; (3) "whether it [was] physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interfere[d] with an employee's work performance." *Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 568 (6th Cir. 2021) (quoting *Harris*, 510 U.S. at 23). And the Court is to consider those factors in conjunction with and against the backdrop of the employment relationship as a whole. That said, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not sufficiently severe or

pervasive to support a retaliatory harassment claim. *Ogbonna-McGruder*, 91 F.4th at 841 (cleaned up).

Because Ebony's retaliation claims are based on two separate protected activities—complaining about Hines's racist statements (which led to Hines's and Haynes's alleged harassment) and filing the discrimination charges (which led to Camacho's alleged harassment)—the Court analyzes the two sets of alleged harassment in turn.

Start with the alleged retaliatory harassment by Camacho. The Court concludes that the alleged conduct does not objectively rise to the level of severity and pervasiveness required to plausibly support a retaliatory harassment claim. Ebony alleges that one month after filing the OCRC and EEOC charges, Camacho inexplicably visited Ebony to tell her a "bizarre" and "bigoted" narrative, analogizing African Americans to catfish. (Doc. 12, #154–55; Doc. 14, #190). Camacho also apparently used the n-word twice in telling the story. (Doc. 12 at #154). Although Camacho's conduct, if true, was both "deplorable and offensive," it was not sufficiently "aggressive" or "constant" to plausibly allege retaliatory harassment. *Kelly v. Senior Ctrs., Inc.*, 169 F. App'x 423, 429 (6th Cir. 2006). The incident took place in a single interaction (i.e., it was not a frequent occurrence) that did not involve a physical threat, and did not interfere with Ebony's job performance. Of course, any "utterance of a deeply offensive word is, as a matter of social conscience, a [] time too many." *Id.* Even so, this single incident, while involving deeply offensive commentary, is not sufficiently severe to render Camacho's behavior legally actionable as retaliatory

harassment. *See e.g.*, *id.* at 429–30 (finding that two coworkers' racist comments and use of "pejorative slur word[s]" did not support a hostile work environment claim because they were not daily or weekly events); *Middleton v. United Church of Christ Bd.*, No. 20-4141, 2021 WL 5447040, at *5 (6th Cir. Nov. 22, 2021) (explaining that an isolated, race-based comment, while offensive, was not abusive, and thus did not support a hostile work environment claim).

But the Court's analysis does not end there. Turn now to the alleged retaliatory harassment by Hines and Haynes. Ebony's allegations concerning their behavior, when considered in light of the nonexhaustive factors outlined above, demonstrate the severity and pervasiveness necessary to inch Ebony's retaliation claim over the plausibility threshold.

Start with frequency. The Amended Complaint suggests that Hines's harassment was ongoing, or, in other words, frequent. Ebony alleges that after she complained about Hines's racist remarks to Sandfoss (who then relayed those complaints to Hines), Hines "continued to make racist and bigoted statements" to her. (Doc. 12, #145–46). True, as Koch notes, Ebony did not allege when, where, or how often those comments occurred. (Doc. 13, #175). But to survive a motion to dismiss, she need not. *Swierkiewicz*, 534 U.S. at 511 (rejecting "the argument that a Title VII complaint requires greater 'particularity'" and holding that "the ordinary rules for assessing the sufficiency of a complaint apply" (citation omitted)). Hines was Ebony's direct supervisor, (Doc. 12, #144), suggesting that they interacted frequently, if not daily. And according to the Amended Complaint, Hines made at least four racist

comments within Ebony's first month of employment. (*See* Doc. 12, #144–45). That makes it *plausible* that, in the five months before Ebony transferred to Plant B (during which time Hines remained her supervisor, (*see id.* at #145, 151)), Hines made enough racist remarks to constitute "pervasive" harassment. *Johnson v. Ford Motor Co.*, 13 F.4th 493, 506 (6th Cir. 2021) (reversing the district court's conclusion that "constant[]" harassment over a four-month period was insufficient to demonstrate pervasive harassment); *cf. Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 688 (6th Cir. 2024) (concluding that "evidence that [the plaintiff's] immediate supervisor verbally harassed her on a daily basis for several weeks" contributed to the pervasiveness of the harassment). That conclusion seems even more plausible when combined with Ebony's claims that "Hines was well known for making bigoted comments," so much so that "everyone in management knew about it." (Doc. 12, #145). As for Haynes's harassment, Ebony alleges that he "frequently made vulgar comments" and that he physically assaulted her "[o]n multiple occasions." (*Id.* at #148–52). The frequency of the alleged harassment thus weighs in favor of finding that Ebony has plausibly alleged actionable retaliatory harassment.

Now consider severity. As for Hines's harassment, Ebony alleges that Hines continued to make racist comments "*to* Ebony." (Doc. 12, #146 (emphasis added)). That suggests that Hines directed her remarks at Ebony, which contributes to their severity. *See e.g.*, *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 251 (6th Cir. 1998) (explaining that whether a discriminatory comment is directed at a plaintiff-employee "contributes" to the severity of the harassment). So while the Amended

15

Complaint does not provide the precise content of those "racist and bigoted statements," it's plausible they were at least moderately severe. Turning to Haynes's harassment, it was, if anything, even more severe. Ebony alleges, for example, that he "yell[ed] and shout[ed]" at her; made "lurid and overtly sexual" gestures toward her; communicated the sexual acts he wanted to perform on her; groped her; "pinned her body down" so he could "forcefully kiss[] her"; and cornered her in an elevator where he "grab[bed] her breasts and buttocks" and attempted to kiss her. (Doc. 12 at #148–50). And Haynes allegedly continued that harassing behavior even after Ebony transferred to Plant B. (*Id.* at #151–52). That suggests severity. *See, e.g.*, *Hawkins*, 517 F.3d at 334–35 (affirming a summary judgment denial based on evidence that a coworker regularly made "lewd and sexual comments" and "engaged in inappropriate behavior 'like winking, blowing kisses, [and] touching [] or grabbing'" the plaintiff). So this factor likewise supports a finding that Ebony plausibly alleged actionable retaliatory harassment.

Next consider the nature of the harassment. While Hines may not have physically threatened or humiliated Ebony, Haynes did. As already explained, at different times, he allegedly pinned her down, cornered her, kissed or attempted to kiss her, inappropriately touched her legs, and made vulgar comments about her body. To rebuff Haynes's harassment Ebony alleges that she had to "push and kick him off of her"; "f[i]ght back" against his advances; "lock[] herself in the nurse's office" with the lights out and blinds closed to avoid drawing his attention; or have a coworker present in the nurse's office to ward him off. (Doc. 12, #149–52). It seems

16

plausible, then, that a reasonable person would view the alleged harassment as both physically threatening and humiliating. But beyond even that, Ebony claims Haynes told her that "he knew where she lived, and that he lived close by," and on multiple occasions, "used his car to block her from leaving" work, (*id.* at #150), both of which intimate threats. So this factor again supports a retaliatory harassment claim.

That leaves job interference. Ebony suggests that Hines interfered with her job in two ways. First, Ebony says Hines emboldened Haynes to berate and intimidate Ebony by informing him that Ebony questioned his immunity from taking a random drug test. (*Id.* at #146–47). And second, Ebony claims that Hines enabled Haynes to deliberately undermine Ebony's work by putting him on the phone when Ebony asked Hines to prohibit Haynes from being present when Ebony treated employees. (*Id.* at #147–48). In addition to all that, Haynes's alleged harassment (outlined above) inspired Ebony to transfer to a different shift at a different plant. (*Id.* at #151 (explaining that Ebony viewed the transfer as "an opportunity for some form of relief")). The alleged job interference therefore also weighs in favor of objectively severe and pervasive harassment.

Taking those nonexhaustive factors in combination, and considering them against the backdrop of Ebony's overall employment experience (while drawing all reasonable inferences in Ebony's favor), the Court concludes that she has plausibly alleged that Hines's and Haynes's conduct both altered the conditions of her employment and created an abusive work environment (i.e., that the alleged retaliatory harassment was objectively severe and pervasive). So even though Ebony

17

did not plausibly allege retaliatory harassment based on Camacho's conduct, her retaliation claims can proceed based on the allegations regarding Hines and Haynes.[5]

Koch's counterarguments, moreover, are unpersuasive. First, Koch relies on *Ogbonna-McGruder* and *Bady v. Illinois Cent. R.R. Co.*, No. 2:21-cv-2693, 2023 WL 2482229 (W.D. Tenn. Mar. 13, 2023), to argue that Ebony has not plausibly alleged retaliatory harassment. In *Ogbonna-McGruder*, the Sixth Circuit affirmed dismissal of the plaintiff's retaliatory hostile work environment claim based on allegations that her supervisors instructed her to move to the basement office, scolded her, and twice disparaged her job performance. 91 F.4th at 840–41. The court concluded that those incidents, which arose over a two-and-half-year span, were too infrequent; that the supervisors' comments were offensive, but "not sufficiently serious" to be severe; that none of the incidents involved physical threats; and that the plaintiff's allegations regarding job interference were conclusory. *Id.* at 841. Here, by contrast, Ebony's allegations pass muster on all four fronts (i.e., frequency, severity, nature of harassment, and job interference), as thoroughly explained above. *Ogbonna-McGruder* thus offers Koch no help.

Neither does *Bady*. There, the plaintiff's coworkers drew a chalk line down his buttock, posted a photo of the chalk line to Facebook, then made an offensive comment about the chalk incident two weeks later. *Bady*, 2023 WL 2482229, at *1. The court

---

[5] Because the Court concludes that Ebony plausibly alleged retaliation based on a hostile-work-environment theory of adverse action, which alone suffices to support Ebony's retaliation claim, the Court need not (and does not) reach Koch's argument regarding the failure-to-investigate theory of adverse action.

determined that three "relatively minor incidents over more than two years of employment" demonstrated infrequency; that none of the incidents were physically threatening or severe; and that the plaintiff offered no allegations to suggest the coworkers' conduct interfered with his job performance. *Id.* at *4–5. While that plaintiff's allegations did not meet the "severe and pervasive" threshold, Ebony's allegations do for the reasons already explained.

Next, Koch argues that because the alleged retaliation did not in fact dissuade Ebony from engaging in protected conduct (i.e., from filing charges with the OCRC and EEOC), her retaliation claim necessarily fails. (Doc. 13, #176–77). While Koch correctly articulates the standard—that in the retaliation context, a materially adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006))—Koch's reasoning falls short. "[F]ederal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge[.]" *Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001). In other words, for Ebony to bring her retaliation claim here, she first had to file an EEOC charge, as would every other plaintiff seeking to advance such a claim. But Koch seems to argue that the mere fact that Ebony filed the OCRC and EEOC charges somehow precludes her retaliation claim (as it shows that Koch's alleged employment action did not actually dissuade her from engaging in protected activity). Putting those together, Koch is basically

arguing a retaliation claim can never proceed. Under Koch's logic, if the plaintiff has filed an EEOC charge for retaliation, it shows they were not dissuaded. And, of course, if the plaintiff fails to file a charge (thus showing they were dissuaded), the court lacks jurisdiction to hear the matter. *Strouss*, 250 F.3d at 342. Nice try, but the Court is not convinced.

Beyond first principles, the cases Koch cites in support of its argument are inapposite. In *Cranfield v. Costco Wholesale Corporation*, the court concluded that the plaintiff failed to put forth evidence suggesting that the defendant's coaching sessions would dissuade a reasonable person from making a discrimination charge. No. 5:20-cv-2565, 2022 WL 3227365, at *10 (N.D. Ohio Aug. 10, 2022). The court then added that the plaintiff had filed EEOC charges, which showed she was not in fact dissuaded. *Id.* But the conclusion that no adverse employment action occurred rested on both findings, not solely on the plaintiff's decision to file charges. *Id.* And nowhere did the court conclude that filing an EEOC charge precludes a later retaliation claim. Neither did the *Bady* court—the other case Koch cites. *Bady*, 2023 WL 2482229, at *7 (finding it implausible that a reasonable person would be dissuaded from making an EEOC charge based on the defendant's inaction regarding the plaintiff's complaints). All told, the Court concludes that Ebony's decision to file an OCRC and EEOC charge does not nullify her retaliation claim.

20

**B.**     **Ebony Has Plausibly Alleged a Causal Connection.**

In its Reply, Koch claims that Ebony failed to plausibly allege the causal connection element of her prima facie case. Before turning to the merits, the Court starts with a procedural concern.

"It is well established that a moving party may not raise a new issue for the first time in its reply brief[.]" *SAT Tech., Inc. v. CECO Env't Corp.*, No. 1:18-cv-907, 2023 WL 6119934, at *3 n.7 (S.D. Ohio Sept. 19, 2023) (quoting *Probst v. Cent. Ohio Youth Ctr.*, 511 F. Supp. 2d 862, 871 (S.D. Ohio 2007)). But that seems to be what Koch is attempting here. The thrust of Koch's brief in support of its motion to dismiss was that Ebony failed to plausibly allege any adverse employment action. (*See, e.g.*, Doc. 13, #169, 177 (concluding that dismissal is appropriate "because the factual allegations in the Amended Complaint do not establish that Ebony was subjected to a materially adverse employment action")). True, in passing, Koch summarily stated one time that Ebony did not allege facts to plausibly assert a causal connection. (*Id.* at #174). But Koch did not develop that argument in any way, either by citing caselaw in support or by explaining why the alleged facts are insufficient on that front. In its Reply, however, Koch dedicated multiple pages to the causal connection element. (Doc. 16, #204–07). Koch's belated efforts to develop the causal connection argument likely amount to forfeiture, in which case the argument is not properly before the Court. *See Trout v. Univ. of Cincinnati Med. Ctr., LLC*, 743 F. Supp. 3d 937, 946 n.8 (S.D. Ohio 2024) (citing *SAT Tech.*, 2023 WL 6119934, at *3 n.7).

In any event, the argument lacks merit. When it comes to plausibly alleging a causal connection between protected activity and an adverse action, a plaintiff's

burden is "minimal." *Finley*, 504 F. Supp. 3d at 849 (citing *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). The plaintiff need only offer "some fact creating an inference that the adverse action would not have occurred without the employee first engaging in protected activity." *Sizemore v. Edgewood Bd. of Educ.*, No. 1:19-cv-555, 2020 WL 1904726, at *8 (S.D. Ohio Apr. 17, 2020) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

Ebony has plausibly alleged a causal connection between her complaint about Hines and Haynes's alleged harassment, if barely.[6] The Amended Complaint alleges that Ebony complained about Hines on February 7, 2023, (Doc. 12, #145), and that Haynes's first harassing act occurred in "late February of 2023," (*id.* at #146). Ebony further details that Haynes harassed her "[o]ver the next several months." (*Id.* at #148). That timeline is enough to prod her claims just slightly over the plausibility threshold. *See Finley*, 504 F. Supp. 3d at 850; *see also Thornhill v. WillScot Mobile Mini Holdings Corp.*, __ F. Supp. 3d __, 2025 WL 275130, at *11 (M.D. Tenn. 2025). More than that, the Amended Complaint suggests that Hines and Haynes regularly communicated. For example, Hines allegedly called Haynes to inform him that Ebony had questioned whether he needed to take a drug test. (Doc. 12, #146–47). And after Ebony privately raised concerns to Hines about Haynes interfering with Ebony's medical evaluations of workers, Hines conveyed that concern to Haynes. (*Id.* at #147–

---

[6] Because the Court agrees with Koch that Ebony's allegations regarding Camacho are not sufficiently severe and pervasive to state a retaliatory harassment claim, it need not address whether Ebony has plausibly alleged a causal connection between Ebony filing the discrimination charges and Camacho's alleged retaliation.

48). Those facts allow the Court to reasonably infer that Hines likewise communicated Ebony's complaint about Hines to Haynes, and that Haynes would not have harassed Ebony but-for her first complaining about Hines. Of course, a more fully developed record may reveal that Ebony has not, in fact, established a causal connection between her complaint about Hines and Haynes's resulting harassment. If so, Koch is free to re-raise that argument in a motion for summary judgment. But given that this case is merely at the motion-to-dismiss stage, the Court is satisfied that Ebony has met her minimal burden in plausibly alleging causation (which the Court reiterates is a sufficient but not a necessary, condition for surviving a motion to dismiss, *see supra* note 4).

Koch urges a different result. It first argues that Ebony had to state "facts to support a conspiracy between Hines and Haynes" to plausibly allege a causal connection between Ebony's complaint concerning Hines and Haynes's alleged harassment. (Doc. 16, #204). That, however, is simply untrue. As explained, Ebony's pleading burden is minimal—she need only offer "some fact" that allows the Court to infer causation. *Sizemore*, 2020 WL 1904726, at *8. And she did. Koch, moreover, cites no cases suggesting that Ebony needed to establish a conspiracy between Hines and Haynes to pass the *Iqbal/Twombly* threshold on causation. Absent any such caselaw, the Court is not persuaded that Ebony failed to meet her pleading burden.

Koch next argues that Ebony failed to plausibly allege causation because Ebony did not expressly complain of Haynes's harassment until after Koch fired him. (Doc. 16, #206). And that in turn means that no one who knew of Ebony's

complaint about Hines's racist comments also knew about Haynes's alleged sexual harassment. (*Id.*). Koch's argument fails, though, because Ebony did allege that "[m]ultiple managers" knew Haynes was harassing her and did nothing to stop it. (Doc. 12, #153). So, whether Ebony formally complained before Haynes's termination or not, the Amended Complaint plausibly alleges that, beyond knowing Ebony complained about Hines, Koch knew of Haynes's harassment and failed to address it. From that, the Court can reasonably infer that Koch would not have allowed Haynes to (allegedly) harass Ebony but-for her complaint about Hines.

All told, the Court finds that Ebony has plausibly alleged a causal connection.

## CONCLUSION

For the reasons stated, the Court **DENIES** Defendants' Motion to Dismiss Counts VI, VII, and VIII of Plaintiffs' Amended Complaint (Doc. 13).

**SO ORDERED.**

April 7, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

24